**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; COMMONWEALTH OF VIRGINIA; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development,

Defendants.

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. For the last 30 years, the federal government has allowed low-income U.S. citizens and eligible non-citizens to receive federal housing assistance, even when one or more family members in their households are ineligible non-citizens. To avoid subsidizing ineligible non-citizens while not breaking up eligible families, the government prorates federal assistance based on the number of eligible people in the home.

2. The government's consistent policy is no surprise: soon after the U.S. Housing and Urban Development agency ("HUD") implemented this system in 1996, Congress amended the housing statute to expressly incorporate the agency's proration approach.

3. As a result, for decades and across five presidential Administrations, tens of thousands of U.S. citizens and eligible non-citizens in so-called "mixed-status" families have been able to afford housing with government assistance—furthering Congress's "national housing goal of a decent home and suitable living environment for every American family."[1]

4. But now, the Trump Administration seeks to wholly upend the long-established order under the guise of immigration enforcement. HUD now claims that the statute means the opposite of what it says—that it *requires* the exclusion of mixed-status families from federal housing assistance programs. To implement this abrupt course reversal, HUD has promulgated a regulation (the "Challenged Rule") designed to force the exodus or eviction of 55,000 low-income U.S. citizens and eligible non-citizens who live in mixed-status households, more than two-thirds of whom are children or elderly people.[2]

5. HUD asserts that it is effectuating Congress's purpose, but the statute makes clear that mixed-status families who receive prorated assistance "shall not" be subject to termination of benefits for permitting an ineligible person to reside in their home.[3]

---

[1] Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 101(d)(3), 88 Stat. 633, 635 (codified as amended at 42 U.S.C. § 5301(d)(3)).

[2] *See* Housing and Community Development Act of 1980: Verification of Eligible Status, 91 Fed. Reg. 72,978 (Nov. 12, 2026) (to amend 24 C.F.R. pt. 5); *see also* U.S. Dep't of Hous. & Urban Dev., Regulatory Impact Analysis for the Housing and Community Development Act of 1980: Verification of Eligibility Status Proposed Rule 8 (2025) [hereinafter "Proposed Rule Regulatory Impact Analysis"] (estimating that 65 percent of eligible household members in mixed-status families are children and 3 percent are elderly).

[3] 42 U.S.C. § 1436a(d)(6).

6. And HUD does not stop at targeting mixed-status families—a group the agency concedes is a "small (under one percent) and declining share" of all households receiving federal housing assistance.[4] The Challenged Rule also imposes new documentation and verification requirements on *all* U.S. citizens and elderly, eligible non-citizens receiving federal housing assistance. And if those tenants are unable to comply with the agency's expedited timeframe, they too will be subject to eviction from the affordable housing for which they have already qualified.

7. The agency acknowledges the upheaval the Challenged Rule will cause, including the eviction and displacement of tens of thousands of families; millions of dollars in compliance costs borne by state and local governments, public housing authorities, and private owners; and the reduction in the availability and quality of affordable housing.

8. In the face of such upheaval, HUD argues that it has "not characterized cost savings as a benefit of the rule," and the rule's "principal benefit"—to redirect federal financial assistance away from a group it disfavors (mixed-status families) to the families it favors (fully-eligible families)—justifies essentially *any* costs.[5] HUD Secretary Scott Turner has touted the Challenged Rule as a means to reduce federal involvement in providing housing assistance for low-income people because, in the Secretary's view: "the federal government is not good at providing housing," and long-term subsidies are "not the way that it's intended to be."[6]

9. Thus, despite being the federal agency charged with administering programs to provide low-income housing and reduce homelessness, HUD now seeks to implement a policy that

---

[4] Challenged Rule, 91 Fed. Reg. at 72,996.
[5] *Id.* at 72,990, 72,995.
[6] Sunday Night in America with Trey Gowdy, *HUD to Require Tenant Citizenship Verification*, at 4:14–4:40 (Fox News, Nov. 15, 2026), https://tinyurl.com/nw6rs5mk.

will have the opposite effect, *causing* the mass displacement of U.S. citizens and eligible non-citizens from their homes.

10. But federal financial assistance is not a slush fund that executive agencies can redirect at will to the groups they favor. HUD is charged with administering a statutory scheme in furtherance of *Congress's* goals, which are clear: Congress seeks to ensure a decent home and suitable living environment for *all* American families, and Congress's definition includes mixed-status families.

11. And, as Congress recognized when it incorporated HUD's proration framework into statute, ineligible individuals do *not* benefit from federal housing subsidies under current law. Rather, under the proration framework, their share of the rent must be paid without any subsidy. HUD's insistence that merely residing together with eligible family members in a housing unit is equivalent to receiving financial assistance finds no support in the statute.

12. HUD lacks authority to rewrite federal law to exclude families this Administration disfavors from federal affordable housing programs. Like all federal agencies, HUD is a creature of statute with only the authority expressly conferred by Congress. Where—as here—it acts outside that authority, it violates the Administrative Procedure Act ("APA"). So too, HUD violates the APA when it acts contrary to the statutes it is charged with administering.

13. The Challenged Rule also violates the APA because it is arbitrary and capricious for several reasons, including because the agency based the Challenged Rule on misstatements of law; lacked a rational connection between the facts it found and the decision it made; relied on factors that Congress did not intend it to consider; failed to meaningfully consider reliance interests and the tremendous burdens the Challenged Rule will impose on many States in their capacities as

public housing authorities, subsidy administrators, and providers and administrators of social safety net programs; and failed to adequately consider reasonable alternatives.

14. In light of the serious harms the Challenged Rule will cause to the undersigned States and their low-income residents, Plaintiff States respectfully request that the Court declare the Challenged Rule unlawful, vacate it in its entirety, and enjoin HUD from implementing it in any substantially similar form.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. § 706.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

### A. Plaintiffs

17. Plaintiff the State of California, represented by and through its Attorney General Rob Bonta, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

18. Plaintiff the State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

19. Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

20. Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Attorney General Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id*.

21. Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colorado Revised Statute § 24 31-101 to pursue this action.

22. Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

23. Plaintiff State of Delaware is a sovereign state of the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to Del. Code Ann. tit. 29, § 2504, on behalf of the State.

24. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The

Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

25. Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

26. Plaintiff the State of Illinois, represented by and through its attorney general, is a sovereign state of the United States of America. Illinois is presented by and through its chief legal officer, Kwame Raoul, who is authorized to pursue this action on behalf of the State of Illinois. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

27. Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

28. Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

29. Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer for the State of Michigan.

30. The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern.

Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

31. Plaintiff the State of New Jersey is a sovereign state in the United States. New Jersey is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey and is authorized to institute this action.

32. Plaintiff the State of New Mexico, represented by and through its Attorney General, Raúl Torrez, is a sovereign state of the United States of America. As the State of New Mexico 's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

33. The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

34. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

35. Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

36. Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

37. Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

38. Plaintiff the State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, who is the State's chief legal officer.

39. Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B. Defendants**

40. Defendant HUD is an agency within the executive branch of the United States government, headquartered in Washington, D.C. Defendant HUD is the federal agency responsible for administering federal housing programs, including public housing, the Section 8 Housing Choice Voucher program, and project-based rental assistance, among others.

41. Defendant Scott Turner is the Secretary of HUD and the department's highest-ranking official. *See* 42 U.S.C. § 3532. He is responsible for implementing federal housing programs and oversees HUD. He is sued in his official capacity.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

42. On November 12, 2026, HUD promulgated the Challenged Rule, (a) purporting to reinterpret federal law to bar eligible U.S. citizens[7] and eligible non-citizens[8] in mixed-status families from receiving federal housing assistance, and (b) imposing onerous new documentation and verification requirements on all U.S. citizens and elderly, eligible non-citizens receiving federal housing assistance.

### I. Federal Affordable Housing Programs

#### A. Congress's National Housing Goal and Creation of HUD

43. This case concerns the interpretation and application of federal housing assistance programs in place for many decades to assist low-income families in securing quality, affordable housing.

44. Nearly a century ago, Congress enacted the first major federal program dedicated to safe, quality housing for low-income people.[9] When doing so, it articulated the national housing policy that remains in place to the present day, specifically: "[i]t is the policy of the United States . . . to promote the general welfare of the Nation by employing the funds and credit of the Nation" to (a) assist States and local governments in "remedy[ing] the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and in "address[ing] the

[7] This complaint uses "U.S. citizens" as shorthand for both U.S. citizens and U.S. nationals because 42 U.S.C. § 1436a treats these two groups interchangeably. "[N]ational of the United States" refers to U.S. citizens as well as people who, "though not a citizen of the United States, owe[] permanent allegiance to the United States," such as those born in certain U.S. territories. 8 U.S.C. § 1101(a)(22); *see generally* U.S. Dep't of State, Travel.State.Gov: Certificates of Non Citizen Nationality, https://tinyurl.com/yu6v47fb.

[8] Eligible noncitizens include lawful permanent residents (8 U.S.C. §§ 1101(a)(15), (20), 1259), individuals granted refugee status or asylum (8 U.S.C. §§ 1157-58), individuals paroled under 8 U.S.C. § 1182(d)(5), individuals lawfully present due to withholding of deportation under 8 U.S.C. § 1231(b)(3), and individuals admitted to temporary or permanent residence under 8 U.S.C. § 1255a. *See* 42 U.S.C. § 1436a(a)(1)-(6).

[9] *See generally* Housing Act of 1937, Pub. L. No. 75-896, 50 Stat. 888, 888 § 2(a).

shortage of housing affordable to low-income families," and (b) consistent with those objectives, "to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public[.]"[10]

45. In the succeeding decades, Congress enacted and amended significant legislation in furtherance of "the national housing goal of a decent home and a suitable living environment for every American family."[11]

46. Congress designed federal housing programs to provide safe and affordable housing for low-income families, defined as families whose incomes do not exceed 80 percent of the median income of the area.[12] And Congress has further prioritized benefits for "very low-income families" and "extremely low-income families"—defined as families whose incomes are no more than 50 percent or 30 percent of the median family income of the area, respectively.[13]

47. To ensure federal housing assistance flows to its intended recipients, Congress requires families to demonstrate their financial eligibility during the application process and annually thereafter.[14]

---

[10] 42 U.S.C. § 1437(a)(1)(A)-(C).

[11] Pub. L. No. 93-383, § 101(d)(3), 88 Stat. at 635.

[12] 42 U.S.C. § 1437a(b)(2)(A).

[13] *Id.* § 1437a(b)(2)(B), (C)(ii). "Extremely low-income families" is alternatively determined by reference to the federal poverty guidelines. *Id.* § 1437a(b)(2)(C)(i).

[14] *See id.* § 1437a(a)(1) ("Dwelling units assisted under [Chapter 8] shall be rented only to families who are low-income families at the time of their initial occupancy of such units."); *id.* § 1437n(b)(1) (the majority of families initially provided tenant-based assistance must be extremely low-income families); *id.* § 1437n(c)(2) (after 1981, most occupancies in project-based assistance must be made available to very low-income families).

### B. Federal Housing Programs at Issue

48. The Challenged Rule impacts several federal programs that together provide rental assistance to over five million low-income families.[15] In total, 3,058,000 of those families reside in Plaintiff States.[16]

49. The three covered programs serving the vast majority of all federal subsidy recipients nationwide are public housing, project-based rental assistance, and the Section 8 Housing Choice Voucher program.[17]

50. The programs have some differences. Families in public housing and receiving project-based rental assistance use their federal subsidy to live in a designated housing development. In the case of public housing, the housing developments are generally owned directly by local governments or through public benefit corporations. In the case of project-based rental assistance, housing developments are owned by private landlords who agree to maintain affordable rents.

51. In contrast, families participating in the Section 8 Housing Choice Voucher program can use their subsidy to pay a portion of the rent for housing in the private market. The housing units that Section 8 Housing Choice Voucher families reside in are not set aside for people receiving federal housing assistance. They are part of the private rental market and are open to

[15] *Federal Rental Assistance Fact Sheet*, Ctr. on Budget & Pol'y Priorities (Sept. 22, 2026), https://tinyurl.com/3r4y7mnp.

[16] *See id.*

[17] 42 U.S.C. § 1437n(a)-(c); *see* Nat'l Housing Law Project, *Analysis of HUD's Proposed Rule on Mixed Status Families* (Feb. 24, 2026), https://tinyurl.com/yeymfjnt. Some of the programs cross-referenced in the statute have been phased out. *See, e.g.*, Housing and Community Development Act of 1987, Pub. L. 100-242, 101 Stat. 1815, §401(d) (terminating the Section 235 program as of October 1, 1989); 12 U.S.C. §1715z-1(n) (prohibiting issuance of mortgage insurance under Section 236 after November 30, 1983). This section focuses on active programs implicated by the Challenged Rule.

anyone. Federal housing assistance covers a portion of the rent paid by the eligible individuals in the household.

52. The three programs share a common goal to ensure affordable housing is available for low-income families. For each program, eligible tenants typically pay no more than 30 percent of their adjusted monthly income towards their share of the rent.

53. The three federal programs rely on public and private entities to perform the administrative work necessary to keep the programs running, which can include processing applications, verifying eligibility, interacting with families and private housing providers, and, when necessary, terminating subsidies.

54. Entities that perform this work are called Public Housing Agencies ("PHAs").[18] For each program, the PHA may be a state or local government or other entity, and the role the PHA plays varies depending on the program.

55. ***For Public Housing***: PHAs for public housing programs are typically local governments or public benefit corporations that own and operate the subsidized housing units in which participants reside. The PHAs are therefore responsible for everything from eligibility verification to eviction of residents.

56. ***For Project-Based Rental Assistance***: HUD contracts with some state government agencies, as well as other entities, to serve as PHAs for project-based rental assistance. Under this program, PHAs are contract administrators that monitor, provide technical assistance, and report to HUD on properties that have project-based Housing Assistance Payment contracts. The private

[18] *See* 42 U.S.C. § 1437a(b)(6)(A) (defining "public housing agency" to mean "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing, or a consortium of such entities or bodies as approved by the Secretary").

owners of those properties perform the day-to-day tasks associated with administering the subsidies in accordance with the guidelines provided by the HUD Handbook for Multifamily Housing Programs.[19]

57. ***For the Section 8 Housing Choice Voucher program***: PHAs for the Section 8 Housing Choice Voucher program can be state and local government agencies, public benefit corporations, or subcontracting nonprofit organizations. In the City of New York, for example, there are two local PHAs (New York City Housing Authority and New York City Department of Housing and Preservation and Development) and one state PHA (New York State Housing Trust Fund Corporation) that administer the Section 8 Voucher programs appropriated to them. PHAs administering Section 8 Voucher programs enter into Housing Assistance Payment contracts with the private landlords who rent to the subsidized families, pursuant to which the PHAs agree to make monthly rental payments on behalf of the families.[20]

## II. Eligibility for Federal Financial Assistance

### A. Congress Expressly Adopted Proration after Prioritizing Family Unity

58. Congress's statutory scheme is designed to ensure that low-income families can afford housing on a long-term basis.[21] For example, by statute, leases in the Public Housing program "shall be automatically renewed for all purposes except for noncompliance with" community service and economic self-sufficiency requirements.[22] Project-based rental assistance,

[19] U.S. Dep't of Hous. & Urb. Dev., *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs* (Nov. 2013), https://tinyurl.com/278hxdmv.
[20] U.S. Dep't of Hous. & Urb. Dev., *Housing Assistance Payments (HAP) Contract*, OMB Approval No. 2577-0169, https://tinyurl.com/49ux4z7b.
[21] *See generally* 42 U.S.C. §§ 1437-1437z-10.
[22] 42 U.S.C. § 1437d(l)(1).

which relies on contracts with private owners, encourages contracts with PHAs that last for 20 years.[23]

59. Over the years, Congress has introduced certain limitations on eligibility for housing assistance. As relevant here, in 1980, Congress introduced restrictions on eligibility for public housing and Section 8 programs based on immigration status, as part of a broader series of reforms.[24] These restrictions are sometimes referred to as "Section 214"—in reference to the section of the enactment in which they were introduced. They are codified, as amended, in the "Low-Income Housing" Chapter of the "Public Health and Welfare" Title of the U.S. Code.[25]

60. At first, the restrictions were limited to non-citizen students and their non-citizen family members.[26] Congress expanded the restrictions in 1981, directing HUD to "not make financial assistance available for the benefit of any alien" except those with certain lawful immigration statuses.[27] But the 1981 amended eligibility restrictions were never implemented, in part because a federal court enjoined HUD's attempt at rulemaking.[28]

61. A few years later, Congress weighed in again—this time recognizing the need to address mixed-status families, as well as ineligible non-citizen families already living in federally subsidized affordable housing. This time, Congress emphasized the need to balance competing

---

[23] 42 U.S.C. § 1437f(o)(13)(F)(i).
[24] *See* Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 214(b)(2), 94 Stat. 1614, 1637-38 (1980). The Act added Section 214—a provision entitled "RESTRICTION ON USE OF ASSISTED HOUSING"—to the Housing and Community Development Act of 1974.
[25] *See* 42 U.S.C. § 1436a.
[26] *See supra* note 24.
[27] Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 214(a), 95 Stat. 408.
[28] *See Yolano-Donnelly v. Pierce*, No. CIV S-86-846-MLS (E.D. Cal. Dec. 18, 1986), Mem. & Order 11 (enjoining implementation of Restriction on Use of Assisted Housing, 51 Fed. Reg. 11,198, 11,204, 11,215 (Apr. 1, 1986)), available at https://tinyurl.com/yyapvr7d; *see also City of New York v. Pierce*, 609 F. Supp. 798 (S.D.N.Y. 1985). *See also* Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1153, 1239 (Nov. 30, 1983) (prohibiting implementation for one year).

priorities: discouraging unlawful immigration on the one hand, and preserving "the sanctity of the family" on the other.[29] Congress amended Section 214 to introduce a "Preservation of Families" grandfather clause that permitted mixed-status families then-receiving federal housing assistance to continue to receive assistance indefinitely, so long as the head of household or spouse was eligible.[30] As for ineligible families receiving assistance, Congress permitted deferral or termination of assistance for up to three years.[31]

62. HUD implemented these immigration status-based eligibility restrictions in a 1996 rulemaking. When it did so, the agency introduced a new option to balance Congress's competing priorities: mixed-status families who did not qualify for indefinite continuation of assistance could choose to "not contend" the immigration status of ineligible household members, and HUD would reduce their federal housing assistance accordingly. Thus, federal assistance would be prorated to the number of eligible members of the household.[32]

63. In its public notice of the rule, HUD explained that proration permitted the agency to "limit[] assistance to only eligible family members," while also being "consistent with the preservation of [f]amilies provisions of Section 214," which "reflect the concern of the Congress about displacement . . . of families."[33]

---

[29] 100 Cong. Rec. S18615 (daily ed. Dec. 21, 1987) ("[W]e are saying that where you have a mixed family . . . we are not going to force them to break up that family.").
[30] Pub. L. 100-242, § 164(b), 101 Stat. 1815, 1860 (1988) (codified at 42 U.S.C. § 1436a(c)(1)(A)).
[31] *Id.* (codified at 42 U.S.C. § 1436a(c)(1)(B)).
[32] Consolidation and Streamlining of the Restrictions on Assistance to Noncitizens, 61 Fed. Reg. 13,614, 13,616 (Mar. 27, 1996) (24 C.F.R. part 5).
[33] Restrictions on Assistance to Noncitizens, 60 Fed. Reg. 14,816, 14,821-22 (Mar. 20, 1995) (24 C.F.R. parts 200, 215, 235-36, 247, 812, 850, 880-84, 886-87, 900, 904-05, 912, and 960).

64. One year later in 1997, Congress adopted HUD's implementation by codifying proration of benefits to mixed-status families into Section 214.[34] Congress's amendments remain in place to this day.

65. The statute states that HUD "may not make financial assistance available for the benefit" of any ineligible non-citizen, and it defines "financial assistance" to permit proration to mixed-status families. The statutory definition of "financial assistance" in Section 214 reads as follows:

> (b) "Financial Assistance" Defined
>
> i. For purposes of this section the term "financial assistance" means financial assistance made available pursuant to the United States Housing Act of 1937 [or one of several other statutes].
>
> ii. If the eligibility for financial assistance of at least one member of a family has been affirmatively established under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the applicable Secretary shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.[35]

66. Congress also expressly exempted mixed-status families from a statutory provision penalizing families that permit an ineligible person to live with them. Congress amended Section 214 to read: "This provision shall not apply to a family if the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family."[36]

[34] Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 572, 110 Stat. 3009, 3009-684-85 (1996).
[35] 42 U.S.C. § 1436a(b).
[36] *Id.* § 1436a(d)(6).

67. And Congress gave PHAs the discretion to "elect not to affirmatively establish and verify eligibility" for every individual in a household before providing prorated financial assistance to those who are eligible.[37]

68. In short, Congress amended Section 214 to make plain that mixed-status families receiving prorated benefits are *not* subject to termination of benefits as a result of having ineligible non-citizens in the household.

### B. Congress Mandated Different Documentary Requirements and Empowered Local Administrators

69. As Congress amended Section 214's eligibility restrictions, it also introduced different documentary requirements for citizens and non-citizens to prove their eligibility, as well as special rules for the elderly. Amendments in 1986 and 1988 specified:

a. For U.S. citizens, a PHA must require "a declaration . . . stating whether or not the individual is a citizen or national of the United States";[38]

b. For eligible non-citizens under 62, the PHA must require "documentation of an eligible immigration status";[39] and

c. For non-citizens 62 years old and older, Congress did not require any documentation.[40]

70. In its 1988 amendment, Congress explained in its findings and purpose statement its particular concern about the "tragedy" of homelessness among "the elderly."[41]

71. These distinct documentary requirements for different groups remain in place to the present day.

---

[37] *Id.* § 1436a(i)(2)(A).
[38] Pub. L. 99-603, § 121(d)(1)(A), 100 Stat. 3,359, 3,385 (1986).
[39] Pub. L. No. 100-242, § 164(c), 101 Stat. 1,815, 1,861 (1988).
[40] *Id.*
[41] *Id.* § 2(a)(3), 101 Stat. at 1,819.

72. Congress made additional changes to Section 214 in 1998—upon its finding that the public housing system remained "plagued" by programs that were "aggravated" by "the Federal method of overseeing every aspect of public housing by detailed and complex statutes and regulations" and placing "excessive administrative burdens on public housing agencies."[42] Congress's solution: to expressly delegate "authority, discretion, and control" to the "maximum feasibl[e]" extent to "public housing agencies that perform well."[43] And to reduce "excessive administrative burdens" caused by federal bureaucracy, Congress replaced statutory references to the HUD Secretary with "the applicable secretary," which it defined to include public housing agencies actually providing aid.[44]

### C. Documentation and Verification of Families in Practice

73. PHAs and owners of project-based rental assistance developments are required to ensure that subsidized families meet the eligibility requirements established by statute,[45] and that only eligible household members receive federal financial assistance.

74. In practice, when a family applies to a PHA or owner of a project-based rental assistance development, the family must list all members living in the household and provide additional information about each household member, including the amount of income they earn and their country of citizenship.

75. For each household member applying for federal housing assistance, the PHA or owner must verify their immigration status:

[42] Quality Housing and Work Responsibility Act of 1999, Pub. L. No. 105-276, 112 Stat. 2521, § 502 (1998).
[43] *Id.*
[44] *Id.* § 592(a).
[45] *See, e.g.*, 42 U.S.C. § 1437n.

a. For a U.S. citizen, the PHA is authorized to accept a signed declaration from that household member as sufficient proof of citizenship and is not required to review additional documents.[46]

b. For a non-citizen with eligible immigration status who is under 62 years old, the PHA must collect: (i) a signed declaration of their status; (ii) documentary proof of their status; and (iii) a signed verification consent form.

c. For a non-citizen with eligible immigration status who is 62 years old or older, the non-citizen need only submit a signed declaration of their status and proof of their age.

76. Where there is an ineligible non-citizen living in the household, the ineligible non-citizen has the option to refuse to apply for federal subsidies by "not contending" to have an eligible immigration status.[47]

77. When the PHA or owner of project-based rental assistance evaluates an application for subsidized housing for a household with a "not contending" member, the PHA or owner prorates rental assistance to cover only the eligible family members; any family members who do not contend their status do not receive any subsidy. For example, if a household participating in the Section 8 Housing Choice Voucher program has five members, of whom four are eligible and one is not contending, and the total household income (including the income of the not contending member) is $20,000 per year, the PHA would first calculate the subsidy that a household of five eligible people with a $20,000 annual income would receive, and then multiply that subsidy by 4/5—to ensure that the federal subsidy is limited to the four eligible members of the household.

[46] The PHA may, in its discretion, request documents showing citizenship.
[47] *See supra* note 34 (discussing 42 U.S.C. § 1436a(b)(2)).

Thus, any income earned by the ineligible household member reduces the overall household subsidy, and the ineligible member does not receive federal financial assistance.

78. Income and immigration eligibility certifications occur annually after a family is accepted into a subsidized housing program. At these annual recertifications, the family must demonstrate that their income continues to meet the income criteria for their particular subsidy,[48] and they must inform the PHA or owner of any changes to their household composition.

## III. Defendants Promulgate the Challenged Rule

### A. President Trump Directs Agencies to Eliminate Funding to Non-citizens and Increase Verification Requirements

79. Soon after the start of his second term, President Trump issued Executive Order 14218, entitled "Ending Taxpayer Subsidization of Open Borders."[49] The Order's expressed purpose was to ensure that "no taxpayer-funded benefits go to unqualified aliens," and it directed, *inter alia*, the heads of executive agencies to (a) "take all appropriate actions" to ensure that the federally-funded programs each agency administers do not permit "illegal aliens to obtain any cash or non-cash public benefit"; (b) ensure that federal funding to States and localities "do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation"; and (c) "enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien."[50]

80. A week later, President Trump issued Executive Order 14,222, entitled "Implementing the President's 'Department of Government Efficiency' Cost Efficiency

[48] *See, e.g.*, 42 U.S.C. § 1437a(a)(6).
[49] Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025).
[50] *Id.*

Initiative."[51] This Order expressed another goal of the Administration: to "reduce overall Federal spending or reallocate spending to . . . advance the policies of [the] Administration."[52]

81. In response to these Executive Orders, HUD sought to superimpose the Administration's policy priorities on federal housing programs—agency actions which successive courts held to be unlawful.

82. For example, HUD reinterpreted the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA")—which prohibits ineligible non-citizens from receiving certain "federal public benefit[s]"—to newly apply to 12 additional HUD administered federal programs,[53] many of them block grants that provide assistance in emergency or life-threatening situations.[54] This Rule never went into effect, and a court granted summary judgment to a group of 20 States and the District of Columbia, vacating the rule and holding that HUD violated the APA by failing to engage in required notice and comment rulemaking.[55]

83. HUD also repeatedly sought to impose terms and conditions on federal financial assistance that were designed to coerce grantees to assist immigration enforcement efforts. Successive courts held these terms were in excess of HUD's statutory authority, contrary to law, and arbitrary and capricious.[56]

---

[51] Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025).
[52] *Id.* at 11,096.
[53] *New York v. U.S. Dep't of Just.*, No. 1:25-CV-00345-MSM-PAS, 2026 WL 2823528, at *1-3 (D.R.I. Sept. 21, 2026).
[54] *See id.*; Interpretation of "Federal Public Benefit," 90 Fed. Reg. 54,363, 54,364 (Nov. 26, 2025).
[55] *New York*, 2026 WL 2823528, at *6-11.
[56] *See, e.g., Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-CV-626-MSM-AEM, 2026 WL 1863886, at *3-4 (D.R.I. June 29, 2026); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 885-89 (W.D. Wash. 2025), *aff'd in part and remanded sub. nom. Cnty. of King v. Turner*, 189 F.4th 819 (9th Cir. 2026); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, Case No. 26-30117-MJJ, 2026 WL 2521944, at *1 (D. Mass. Aug. 26, 2026).

### B. The Trump Administration Modifies Long-standing Federal Verification Systems, Introducing Errors

84. The Systematic Alien Verification for Entitlements ("SAVE") is a system of federal databases that "provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies."[57] Prior to 2025, SAVE did not have access to natural-born citizens' records, and it accessed only the immigration and naturalization records in the Department of Homeland Security's ("DHS") systems, as well as occasionally the records in systems of the State Department and the Department of Justice.[58]

85. In response to a May 2025 Executive Order, DHS and the Social Security Administration ("SSA") entered into an agreement to overhaul SAVE; the agencies linked SSA's master social security files to SAVE and thereby integrated substantial information about natural-born U.S. citizens into the database for the first time.[59]

86. However, DHS recognized that "[s]hortfalls in data accuracy" in the SSA citizenship data integrated into SAVE "could cause incomplete or false results."[60] For example, earlier this year when HUD directed PHAs to verify a group of tenants with inconsistencies in their SAVE records, PHAs reported that most tenants SAVE identified as suspect were U.S. citizens or eligible non-citizens.[61]

---

[57] *Dept. of Homeland Sec. v. League of Women Voters*, No.26A308, 2026 WL 2879700, at *4 (2026) (Jackson, J., dissenting) (internal citation omitted).
[58] *Id.*
[59] *Id.* at *4-5.
[60] *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 101 (D.D.C. 2026) (alterations in original) (internal citation omitted).
[61] Nat'l Ass'n of Hous. & Redevelopment Offs., Pub. Hous. Auths. Dirs. Ass'n, & MTW Collaborative, Comment Letter on EIV-SAVE Reporting Guidance (Feb. 13, 2026), https://tinyurl.com/47667aj6.

87. The occurrence of such SAVE shortfalls is well-documented, with reports that the system incorrectly identified individuals as non-citizens 25 percent of the time.[62]

88. Groups of U.S. citizens who are likely to be impacted by shortfalls in the SAVE data include naturalized citizens—because they have no legal obligation to report changes in their immigration status or U.S. citizenship to SSA until they request a replacement card or file for a Social Security benefit.[63] SAVE shortfalls are also likely to impact U.S. citizens older than their mid-forties—because SSA did not consistently collect citizenship information until 1981, and elderly U.S. citizens—because they may have received more than one Social Security number before SSA centralized SSN assignments and introduced electronic systems in the 1960s and 1970s.[64]

### C. HUD Proposed the Challenged Rule

89. On February 20, 2026, HUD published a Notice of Proposed Rulemaking (the "Proposed Rule") for the Challenged Rule in the Federal Register.[65] Specifically, HUD proposed interconnected regulatory changes designed to ensure that U.S. citizens and eligible non-citizens in mixed-status families could no longer receive federal housing assistance.[66] HUD also proposed interconnected rule changes requiring documentation and verification of *every* applicant and recipient of assistance regardless of age (notwithstanding that the statute permits signed

[62] *See, e.g.*, Suppl. Mem. in Supp. of Pls.' Mot. for a Stay at 7, *League of Women Voters*, 835 F. Supp. 3d 79 (No. 47), 2025 WL 4113216 (internal citation omitted).
[63] *League of Women Voters*, 835 F. Supp. 3d at 101 (internal citation omitted).
[64] Citizens for Responsibility and Ethics in Washington, Comment Letter on Proposed Rule at 4 n.23 (Apr. 21, 2026), https://tinyurl.com/2ft6wxxb (citing Letter from SSA Off. Of Gen. Couns. to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US); Carolyn Puckett, *The Story of the Social Security Number*, 69 Soc. Sec. Bull. no. 2 (2009), https://perma.cc/59V7-XG2D.
[65] Housing and Community Development Act of 1980: Verification of Eligible Status, 91 Fed. Reg. 8,151 (Feb. 20, 2026) [hereinafter Proposed Rule].
[66] *Id.* at 8,165.

declarations from U.S. citizens and eligible non-citizens 62 years old and older),[67] a proposal which would require 1.9 million tenants to provide documentation of their citizenship for the first time.[68]

90. HUD stated that the Proposed Rule was designed to promptly force mixed-status families out of federally subsidized low-income housing and to redirect federal funding to other families.[69] However, HUD conceded that because mixed-status families receive lower subsidies on average than other families (due to proration), and because the amount of federal funding for housing assistance is fixed, the "primary regulatory effect" of the Proposed Rule would be "to reduce the number of households and family members receiving assistance" by an estimated 31,000 people.[70] As a result, HUD acknowledged that public housing units would be left vacant, depriving public housing authorities of income—with the "likely" result that the quality of affordable housing would suffer because PHAs would need to reduce "overall project expenses such as housing maintenance, protective services, management and leasing services, and/or self-sufficiency programs for tenants."[71] Similarly, private owners of project-based rental assistance housing may receive "fewer contracts (either in terms of projects or units)," losing income as well.[72]

91. HUD further acknowledged that the Proposed Rule would "adversely affect" States, their residents, and private housing providers,[73] and in particular, that it could result in mixed-status families becoming homeless with "substantial" costs borne by local governments—ranging

[67] *Id.* at 8,165-66.
[68] Proposed Rule Regulatory Impact Analysis at 22.
[69] *See id.* at 8,153 n.25.
[70] Proposed Rule Regulatory Impact Analysis at 16-17.
[71] *Id.* at 18.
[72] *Id.*
[73] Proposed Rule, 91 Fed. Reg. at 8,153; *see* Proposed Rule Regulatory Impact Analysis at 21-34.

from $20,000 to $50,000 per person per year.[74] And HUD stated that the Proposed Rule would impose some administrative costs on PHAs and private housing providers, including verification costs, training and hiring costs, costs associated with eviction and turnover of housing units, and other costs, such as those from updating forms, notices, websites, and other documents in order to ensure compliance with the Proposed Rule.[75] HUD's only justification for imposing such devastating harms and costs on those affected by the Proposed Rule was to avoid an outcome that the status quo already addressed—namely, ensuring that only eligible individuals receive federal housing assistance.[76]

**1. Public Commenters Overwhelmingly Opposed the Proposed Rule**

92. HUD received more than 11,000 comments in response to the Proposed Rule.[77] Virtually every part of society affected by the Proposed Rule opposed it, including non-profits, tenant and immigrant advocacy organizations, public housing authorities, housing development officials, private landlords, and state and local governments.[78] Their comments explained that the Proposed Rule would exceed HUD's authority, and even assuming HUD had the requisite

---

[74] Proposed Rule Regulatory Impact Analysis at 35.
[75] *Id.* at 21-27.
[76] *See id.* at 36-37.
[77] Dep't of Hous. & Urb. Dev., *FR-6524-P-01 Housing and Community Development Act of 1980: Verification of Eligible Status*, Regulation.gov (Apr. 21, 2026, at 11:59 p.m.), https://tinyurl.com/yth5fute.
[78] Comments submitted on Regulations.gov docket no. HUD-2026-1099 included Public Housing Authorities Directors Association (Apr. 20, 2026), https://tinyurl.com/4a6zxpzu; Massachusetts Union of Public Housing Tenants and Massachusetts Law Reform Institute (Apr. 15, 2026), https://tinyurl.com/5y29v4k5; National Association of Housing and Redevelopment Officials (Apr. 21, 2026), https://tinyurl.com/4b3hpfat; New Jersey Apartment Association (Apr. 21, 2026), https://tinyurl.com/y3k6pyze; Citizens for Responsibility and Ethics in Washington (Apr. 21, 2026), https://tinyurl.com/2ft6wxxb; Attorneys General of Twenty-Two States (Apr. 21, 2026), https://tinyurl.com/f9ue5mey; and City and County of San Francisco and Nineteen Other Localities (Apr. 22, 2026), https://tinyurl.com/mscrfufh.

authority, the Proposed Rule would have devastating effects and undermine federal housing programs.[79]

93. Major non-profits and tenant and immigrant advocacy organizations provided evidence that the Proposed Rule would destabilize families receiving prorated assistance, displace U.S. citizen children from their homes, and result in U.S. citizens losing assistance because of the difficulties they would face in complying with the new documentation and verification procedures.[80] Commenters emphasized that the Proposed Rule would result in fear, trauma, self-eviction, and homelessness for impacted communities, would divert funding away from housing assistance and towards eviction and complying with burdensome new regulations, and would result in fewer households receiving assistance during a national housing crisis.[81]

94. Commenters also opposed the Proposed Rule because it weakened protections for tenants, including by removing a method to appeal ineligibility determinations[82] and by removing the definition of "other affordable housing" used to determine when temporary deferrals of termination would issue.[83]

95. Public housing authorities, housing development officials, and private landlords opposed the Proposed Rule as expensive and burdensome.[84] These groups explained that the rule

---

[79] *See supra* note 78.
[80] *See, e.g.*, Mass. Union of Pub. Hous. Tenants & Mass. L. Reform Inst., Comment Letter on Proposed Rule at 2, 5-10 (Apr. 15, 2026), https://tinyurl.com/5y29v4k5; Cesar Chavez Found., Comment Letter on Proposed Rule at 2 (Apr. 16, 2026), https://tinyurl.com/28snf35u; Nat'l All. to End Homelessness, Comment Letter on Proposed Rule (Apr. 17, 2026), https://tinyurl.com/un24txpu.
[81] *See supra* note 78.
[82] *See* Challenged Rule, 90 Fed. Reg. at 72,987.
[83] Attorneys General, Comment Letter on Proposed Rule at 18 (Apr. 21, 2026), https://tinyurl.com/f9ue5mey.
[84] *See, e.g.,* Pub. Hous. Auths. Dirs. Ass'n, Comment Letter on Proposed Rule (Apr. 21, 2026), https://tinyurl.com/4a6zxpzu; Nat'l Ass'n of Hous. & Redevelopment Offs., Comment Letter on

would result in more evictions, which is an expensive and time-consuming process for property owners;[85] turning over a unit costs landlords on average $2,500.[86] On top of that, the Proposed Rule would increase fair housing complaints and related legal costs, strain legal aid systems, impose verification, documentation, compliance, and reputational costs, and force landlords to rely on the imperfect SAVE system.[87] PHAs explained that the Proposed Rule would result in increased per unit subsidy costs, leading fewer landlords to participate in HUD programs and further reducing the supply of assisted units.[88] Several organizations pointed to the Proposed Rule's potential conflict with state law, which would create regulatory uncertainty for landlords.[89]

96. Finally, state and local governments, including Plaintiff States, described—in addition to the above effects on their residents and communities—the impact and burdens they would face as a result of increased homelessness caused by the Proposed Rule.[90]

### 2. HUD Promulgated the Challenged Rule, Substantially Unchanged

97. HUD issued the Challenged Rule on November 12, 2026, with an effective date of December 14, 2026.[91] Despite the significant opposition expressed in the comments, the Challenged Rule is substantially the same as the Proposed Rule.

98. Just as HUD proposed, the Challenged Rule prohibits mixed-status families from receiving prorated assistance indefinitely, as they have for decades, and imposes onerous

---

Proposed Rule (Apr. 21, 2026), https://tinyurl.com/4b3hpfat; N.J. Apartment Ass'n, Comment Letter on Proposed Rule (Apr. 21, 2026), https://tinyurl.com/y3k6pyze.

[85] *See supra* note 78.

[86] Pub. Hous. Auths. Dirs. Ass'n, Comment Letter on Proposed Rule at 3.

[87] *See supra* note 78.

[88] Pub. Hous. Auths. Dirs. Ass'n, Comment Letter on Proposed Rule (Apr. 21, 2026), https://tinyurl.com/4a6zxpzu.

[89] *See, e.g.*, *id*. at 3-5; N.J. Apartment Ass'n, Comment Letter at 2, https://perma.cc/JG95-DAZ9.

[90] Attorneys General, Comment Letter on Proposed Rule at 6-13, https://tinyurl.com/f9ue5mey; Cnty. & Cnty. of S.F. and Nineteen Other Localities, Comment Letter on Proposed Rule at 2-8 (Apr. 22, 2026), https://tinyurl.com/mscrfufh.

[91] Challenged Rule, 91 Fed. Reg. at 72,978.

documentation and verification requirements for the first time on all U.S. citizens and on eligible non-citizens who are 62 and older.[92] Thus, while the Challenged Rule purports to target mixed-status families specifically, it also imposes far-reaching and costly consequences on U.S. citizen and eligible non-citizen tenants and applicants, as well as PHAs and private owners.

99. For mixed-status families, the Challenged Rule will necessarily result in U.S. citizens and eligible non-citizens in those households losing their federal housing assistance, or in the forcible separation of those families—exactly contrary to Congressional intent. Specifically, the Challenged Rule purports to rewrite the statutory text to ensure that proration is only "temporary" (except for families grandfathered in by the 1987 Act).[93] It rescinds the three-decade old HUD regulations, recognized by Congress in statutory amendments, that permitted ineligible non-citizens in mixed-status families to not contend their eligibility.[94]

100. For all U.S. citizens and eligible non-citizens 62 years old and older in mixed-status families, the Challenged Rule also imposes new documentation and verification requirements. Specifically, U.S. citizens are now required to submit, in addition to a declaration attesting to their citizenship, their Social Security Number and a verification consent form permitting responsible entities to review the submitted documents and to run those documents and information through SAVE.[95] Eligible non-citizens who are 62 years old and older are now required to submit, in

---

[92] *Id.* at 72,978-79.

[93] *Id.* at 72,978; *see also* Proposed Rule, 91 Fed. Reg. at 8,155 ("[P]rorated assistance should rarely be applicable and then of short duration.").

[94] *Compare* 24 C.F.R. § 5.508(e) (current), *with* Challenged Rule, 91 Fed. Reg. at 73,026-27 (24 C.F.R. § 5.508 (revised)).

[95] *Compare* 24 C.F.R. § 5.508(b)(1) (current), *with* Challenged Rule, 91 Fed. Reg. at 73,026 (24 C.F.R. § 5.508(b)(1) (revised)).

addition to a declaration attesting to their immigration status and a proof of age document, documentation of their eligible status and a verification consent form for SAVE.[96]

101. Individuals in mixed-status families must comply with these requirements within 90 days of the Rule's effective date, that is, by March 14, 2027.[97] Individuals in non-mixed-status families must comply with these requirements at the first annual or interim reexamination of income and household composition after December 14, 2026.[98]

102. Where verification of an individual's citizenship through SAVE fails, the individual is required to submit additional evidence—such as an original or certified copy of their birth certificate, naturalization certificate, or passport—within 30 days of being notified that the primary verification failed.[99] Where verification of an individual's eligible immigration status through SAVE fails, the individual has an opportunity to submit additional evidence, though they are not required to do so.[100]

103. Individuals may also seek from the PHA or owner an extension of up to 60 days to submit this additional evidence of their citizenship or eligible status—but *only if* they first submit a declaration of eligibility and verification consent form, and they certify that they are actively working to obtain any required evidence that is temporarily unavailable.[101]

104. These new requirements are particularly burdensome to low-income and elderly individuals who frequently lack access to the documents required to verify status, and the requirements will inevitably result in significant loss of federal housing assistance.

---

[96] *Compare* 24 C.F.R. § 5.508(b)(2) (current), *with* Challenged Rule, 91 Fed. Reg. at 73,026 (24 C.F.R. § 5.508(b)(2) (revised)).
[97] Challenged Rule, 91 Fed. Reg. at 73,027 (24 C.F.R. § 5.508(f)(2)(i) (revised)).
[98] *Id.* (24 C.F.R. § 5.508(f)(2)(ii) (revised)).
[99] *Id.* at 73,028 (24 C.F.R. §§ 5.510(b), 5.512(d)(2) (revised)).
[100] *Id.* (24 C.F.R. §§ 5.512(d)(3), 5.510(c) (revised)).
[101] *Id.* at 73,027-28 (24 C.F.R. § 5.508(g) (revised)).

105. And for PHAs and owners, as well as the States that administer and finance housing programs, all aspects of the Challenged Rule impose significant burdens.

106. For example, PHAs and owners must:

a. Create their own declaration and verification documents;[102]

b. By January 11, 2027,[103] create and send notice to all subsidy recipients that the PHA or owner must collect and review evidence of eligibility for all people in the household, and specify that the PHA or owner "must inform DHS immediately whenever personnel determine that any member of a household is present in the U.S. in violation of the Immigration and Nationality Act";[104]

c. Conduct primary verification of the immigration status of all U.S. citizens and eligible non-citizens using SAVE;[105]

d. Where primary verification does not confirm the individual's status, provide the individual with notice that secondary verification will be conducted and that the individual may request that the relevant federal agency update or correct their records;[106]

e. Conduct secondary verification of immigration status, which requires manual review of documents for both U.S. citizens and eligible non-citizens. Additionally, for all non-citizens and for some citizens, the PHA or owner must request secondary

---

[102] Proposed Rule, 91 Fed. Reg. at 8,155 n.34; Challenged Rule, 91 Fed. Reg. at 73,026-27 (24 C.F.R. § 5.508(c), (d) (revised)).

[103] The Challenged Rule provides conflicting guidance as to the January deadline for notice. *Compare* Challenged Rule, 91 Fed. Reg. at 73,009 (referencing notice "within 30 days of the rule's effective date" of December 14, 2026—which would be January 13, 2027), *with id.* at 72,027 (24 C.F.R. § 5.508(e)(1)(ii) (revised) (notice deadline is "no later than January 11, 2027").

[104] Challenged Rule, 91 Fed. Reg. at 73,026–27 (24 C.F.R. § 5.508(e)(1), (e)(2)(vi) (revised)).

[105] *Id*. at 73,028 (24 C.F.R. § 5.512(c) (revised)).

[106] *Id*. at 73,028 (24 C.F.R. § 5.512(d)(1) (revised)).

verification through SAVE within 30 days of notifying the individual of the results from primary verification;[107]

f. Where secondary verification does not confirm status, issue a denial of benefits notice with the right to request an informal hearing within 30 days;[108]

g. Where the individual requests an informal hearing, conduct the hearing;[109]

h. Institute eviction proceedings against families who are no longer eligible for or unable to substantiate their eligibility for benefits in public housing and project-based rental assistance developments;[110]

i. For U.S. citizens and eligible non-citizens who do not act quickly enough to have their documents verified on HUD's timeline, adjudicate new housing benefits applications; and

j. Retain all related documentation for five years.[111]

107. With respect to the notice required by January 11, 2027, *see supra* ¶ 106(b), HUD claims to be enforcing a long-standing statutory reporting requirement "as clarified in [a] 2000

---

[107] *Id.* at 73,028 (24 C.F.R. § 5.512(d)(2), (3) (revised)).

[108] *Id.* at 73,028-29 (24 C.F.R. §§ 5.512(e), 5.514(d), (e) (revised)). Issuing a denial of benefits notice, conducting an informal hearing, and instituting eviction proceedings are procedures required under the prior HUD regulations that will be required in many more cases as a result of the Challenged Rule.

[109] *Id.* at 73,029 (24 C.F.R. § 5.514(e) (revised)). The Challenged Rule eliminates the existing administrative appeal procedure. *Compare* 24 C.F.R. § 5.514(e) (current), *with* Challenged Rule, 91 Fed. Reg. at 73,029 (24 C.F.R. § 5.514(e) (revised)).

[110] *Compare* 24 C.F.R. § 5.514(*i*) (current), *with* Challenged Rule, 91 Fed. Reg. at 73,030 (missing 24 C.F.R. § 5.514(*i*)). Under the Challenged Rule, HUD is permitted to cut federal housing assistance after the informal hearing—and no longer must wait until "all appeals have been exhausted," as was the case under the prior rule.

[111] Challenged Rule, 91 Fed. Reg. at 72,029-30 (24 C.F.R. § 5.514(g) (revised)).

Interagency Notice,"[112] but the Challenged Rule misstates and confuses multiple aspects of the reporting requirements.[113] First, the Challenged Rule requires private owners to provide notice to tenants that they "must" report to DHS,[114] but the statutory reporting requirement applies only to "public housing agenc[ies]" and HUD—*not* to private owners.[115] Second, the Challenged Rule states the PHA or owner must inform DHS "immediately"[116]—notwithstanding that the statute imposes the requirement "at least 4 times annually and upon request of [DHS]."[117] Third, the Challenged Rule requires notice to be provided whenever the PHA or owner "determine[s]" a tenant is present in violation of the Immigration and Nationality Act[118]—notwithstanding that the statute uses the word "knows,"[119] which HUD and other federal agencies defined in HUD's 2000 Interagency Notice to require a "formal determination that is subject to administrative review."[120] Fourth, the Challenged Rule states that notice must be provided when a tenant is "present in the U.S. in violation of the Immigration and Nationality Act"[121]—but the statute speaks in terms of "not lawfully present in the United States,"[122] a term of art added to the statute in 1997 that has a specific and relatively narrow meaning.[123]

---

[112] *Id.* at 72,986 (stating that 65 Fed. Reg. 58,301 "clarified" Section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (codified in 42 U.S.C. § 1437y)).
[113] *See id.* at 73,027 (24 C.F.R. § 5.508(e)(2)(vi) (revised)).
[114] *See, e.g.*, *id.* at 72,978-79.
[115] 42 U.S.C. § 1437y.
[116] Challenged Rule, 91 Fed. Reg. at 73,027 (24 C.F.R. § 5.508(e)(2)(vi) (revised)).
[117] 42 U.S.C. § 1437y.
[118] Challenged Rule, 91 Fed. Reg. at 73,027 (24 C.F.R. § 5.508(e)(2)(vi) (revised)).
[119] 42 U.S.C. § 1437y.
[120] Soc. Sec. Admin., Dep't of Health & Hum. Servs., Dep't of Labor, Dep't of Hous. & Urb. Dev., Dep't of Just., Immig. & Naturalization Serv., *Responsibility of Certain Entities To Notify the Immigration and Naturalization Service of Any Alien Who the Entity "Knows" Is Not Lawfully Present in the United States*, 65 Fed. Reg. 58,301, 58,302 (Sept. 28, 2000).
[121] Challenged Rule, 91 Fed. Reg. at 73,027 (24 C.F.R. § 5.508(e)(2)(vi) (revised)).
[122] 42 U.S.C. § 1437y.
[123] *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053,1059 (9th Cir. 2014).

108. The following chart highlights some major changes the Challenged Rule imposes on PHAs and private owners, as compared to existing law[124]:

| | **Existing Law** | **Challenged Rule** |
|---|---|---|
| ***Mixed-Status Families*** | Families can live together in HUD-assisted housing as long as at least one family member is a U.S. citizen or eligible non-citizen. | Families can live together in HUD-assisted housing only if every family member is a U.S. citizen or an eligible non-citizen.<br><br>The prohibition on mixed-status families extends to U.S. citizen spouses and children of certain non-citizen students. |
| | Ineligible non-citizens in the mixed-status household have the right to not contend eligibility; these family members do not receive HUD assistance. | All family members must demonstrate their eligibility. |
| | Mixed-status families can receive prorated rental assistance that covers only eligible family members. These families pay the rest of the rent themselves. | Ongoing prorated rental assistance is not available. |
| | | |
| ***Documentation and Verification Requirements*** | To verify U.S. citizen status, the PHA or owner must obtain:<br>(i) a signed declaration of U.S. citizenship from the individual.<br><br>Public housing authorities have discretion to request documents proving citizenship. | To verify U.S. citizen status, the PHA or owner must obtain:<br>(i) a signed declaration of U.S. citizenship from the individual;<br>(ii) the individual's Social Security Number; and<br>(iii) a signed verification consent form from the individual to access SAVE.<br><br>The PHA or owner must use SAVE to verify U.S. citizenship. If SAVE's automated response does not confirm citizenship or nationality, the PHA or |

124 *See generally* Nat'l Hous. Law Project, *Analysis of HUD's Proposed Rule on Mixed Status Families* at 4 (Feb. 24, 2026), https://tinyurl.com/yeymfjnt.

| | | |
|---|---|---|
| | | owner must obtain documents, such as a birth certificate or U.S. passport, from the individual to verify their citizenship. The PHA or owner may need to request verification through SAVE again. |
| | To verify eligible immigrant status for people 62 years old and older, the PHA or owner must obtain:<br>(i) a signed declaration of their status and<br>(ii) documentary proof of age. | To verify eligible immigration status, all noncitizens, including older noncitizens, must submit:<br>(i) a signed declaration of their status;<br>(ii) documentary proof of their status; and<br>(iii) a signed verification consent form. |

109. Secretary Turner made a number of public comments about the Challenged Rule following its finalization. On November 12, 2026, Secretary Turner issued a social media post claiming that "Illegal aliens and ineligibles were siphoning up to $218 million a year in taxpayer-funded housing assistance,"[125] despite HUD's own analysis stating that $218 million a year in prorated assistance goes to the U.S. citizens and eligible noncitizens within mixed-status families.[126] On November 15, 2026, Secretary Turner appeared in a Fox News interview discussing the Challenged Rule, stating, "[a]nd if this is a [U.S.] citizen" in a mixed-status family, "either it's them or the whole family [that] has to be removed."[127] In this same interview, the interviewer questioned the federal government's involvement in housing assistance, and Secretary Turner agreed: "As you've seen, the federal government is not good at providing housing. . . . We have people who have been living in HUD-funded housing, taxpayer-funded housing for decades upon

---

[125] Scott Turner (@SecretaryTurner), X.com (Nov. 12, 2026), https://tinyurl.com/3uc7f9d5.
[126] Dep't of Hous. & Urb. Dev., Housing and Community Development Act of 1980: Verification of Eligibility Status Final Rule 9–10 (Sept. 30, 2026) [hereinafter "Final Rule Regulatory Impact Analysis"].
[127] Sunday Night in America with Trey Gowdy, *HUD to Require Tenant Citizenship Verification*, at 3:17-22 (Fox News, Nov. 15, 2026), https://tinyurl.com/nw6rs5mk.

decades, generations, able-bodied, able-minded people, and I believe that's not the way that it's intended to be."[128] Secretary Turner suggested that the government should "let the private sector come in"" and agreed that it should "not [be] the federal government" providing housing assistance.[129]

## IV. The Challenged Rule Harms Plaintiff States and their Residents

110. The impacts of the Challenged Rule on Plaintiff States are profound and complex. Not only does the Challenged Rule have direct impacts on the Plaintiff States, including direct financial impacts, but the Challenged Rule also targets Plaintiff States' most vulnerable residents—which in turn impacts Plaintiff States' housing programs and social services.

### A. The Challenged Rule Targets Vulnerable American Families

111. Tens of thousands of families living in Plaintiff States will lose their housing assistance due to the Challenged Rule and therefore face homelessness and related hardships.

112. Not only will approximately 20,000 mixed-status families, composed of 78,100 individuals, lose their subsidies, as HUD acknowledges,[130] but scores of additional families will lose their subsidies when they cannot meet the Challenged Rule's new and onerous verification requirements. HUD concedes that citizens with HUD subsidies face significant barriers to securing the documentation the Challenged Rule requires—and may lose access to subsidies as a result—but does nothing to address the problem.[131] Nationwide, approximately 3.8 million adult U.S.

---

[128] *Id.* at 3:48-4:40.
[129] *Id.* at 4:40-5:02.
[130] Final Rule Regulatory Impact Analysis at 45.
[131] *Id.* at 28-33.

citizens lack any form of documentation proving citizenship, and it is estimated that another 17.5 million U.S. citizens face barriers to getting such documentation.[132]

113. For families living in public housing and project-based rental assistance developments, where the housing subsidy is tied to a particular unit, losing a subsidy means losing their home. Families whose subsidies are terminated will face eviction because the lease for their unit requires that they remain eligible for the subsidy.

114. For families with Housing Choice Vouchers, termination from their subsidy means that their lease with their private landlord terminates.[133] Accordingly, the fate of these families will be in the hands of their private landlords, who may seek their eviction. HUD concedes, however, that even if a private landlord is willing to negotiate a new lease agreement with a family that has lost their subsidy, the market rent for the unit will be unaffordable for the family.[134] Thus, these families will similarly face displacement from their homes.

115. The families who are evicted or forced to leave their subsidized housing unit because of the Challenged Rule are likely to become homeless because they are low-income and affordable housing is limited.

116. Even if a family is lucky enough to find alternative housing that they can afford after losing their subsidy, they will nevertheless be burdened by moving costs and the costs of renting a new unit.[135]

---

[132] Erik Gartland & Sonya Acosta, *Administration Plan Targeting Immigrants Would Take Away Rental Assistance, Create New Barriers*, Ctr. on Budget & Pol'y Priorities (Dec. 12, 2025), https://tinyurl.com/4hkzebmz.
[133] U.S. Department of Housing and Urban Development, Form HUD-52641-A, ¶ 12 (Oct. 2026), https://tinyurl.com/j5a2ace4.
[134] Final Rule Regulatory Impact Analysis at 35 n.59.
[135] *Id.* at 33-34.

117. In addition to harming mixed-status families and families who cannot comply with the new documentation requirements, the turnover and administrative burdens caused by the Challenged Rule will harm all families in the programs. As HUD acknowledges, the administrative burdens imposed by the Challenged Rule may discourage private owners from participating in the Section 8 Housing Choice Voucher program at all.[136] Currently, many private owners are reluctant to rent to families with Housing Choice Vouchers, particularly in tight housing markets. This reluctance has led to decreasing success rates in placing vouchers and longer wait times to find suitable housing.[137] Thus, even for those who satisfy its eligibility and documentation requirements, the Challenged Rule will make finding a suitable unit even harder for those voucher holders looking to place their voucher.

**B. The Challenged Rule Harms Plaintiff States**

118. In addition to causing housing instability and homelessness for residents of Plaintiff States, the Challenged Rule directly harms Plaintiff States in at least four ways: (i) increased costs associated with administration of subsidized housing programs; (ii) increased social safety net spending; and (iii) reduced income from state-financed developments housing subsidized tenants.

**1. Increased Administration Costs**

119. The Challenged Rule will impose substantial administrative costs on Plaintiff States that administer programs covered by Section 214.

120. Some Plaintiff States, including New York, Massachusetts, Maine, Michigan, Minnesota, New Mexico, and Oregon, have agencies that serve as contract administrators of project-based Section 8 rental assistance. In that role, the agencies monitor, provide technical

[136] *Id.* at 26.
[137] Meryl Finkel & Larry Buron, *Study on Section 8 Voucher Success Rates*, U.S. Department of Housing and Urban Development Office of Policy and Development Research, at 3-12–3-13 (2001), https://tinyurl.com/3uxpc7bf.

assistance, and report to HUD on properties that have project-based Housing Assistance Payment contracts.

121. The Challenged Rule will require that these agencies revise policies and procedures and respond to inquiries from owners of subsidized projects about the new verification requirements.

122. The wave of subsidy terminations that the Challenged Rule is designed to generate will also require that these state agencies increase their staff time devoted to oversight of project-based rental assistance developments. Property owners who are not equipped to conduct the subsidy terminations inevitably resulting from the Challenged Rule—including handling all administrative appeals and resulting litigation—will require the support and guidance of the state agencies. These new obligations will cost States money. They will require additional staffing, additional staff time spent managing this process, and additional training, at the least. The Regulatory Impact Analysis acknowledges these costs.

123. Some Plaintiff States, including New York, Massachusetts, Connecticut, Colorado, Maine, and Michigan, have agencies that serve as PHAs for the Section 8 Housing Choice Voucher program. The Challenged Rule will cause these agencies to devote substantial additional time to administration of the vouchers. Agencies will have to notify all subsidized families and private owners of the Challenged Rule's requirements and establish new policies to conform to those requirements. These agencies will then have to conduct time-intensive verification reviews, including first identifying which families have missing or inadequate documentation of immigration status (especially U.S.-born citizens and individuals over 62), then notifying the families of the requirement to provide additional documentation, and then conducting outreach to those families and individuals. The agencies will have to run the documentation that is provided

through the SAVE system, which may erroneously flag eligible individuals as ineligible. The agencies will have to manually review these cases to determine whether the documentation is acceptable. Then, if the agency determines after these reviews that a family cannot demonstrate immigration eligibility of all family members, it must issue a notice of subsidy termination. This marks the beginning of the administrative hearing process, which depending on the jurisdiction, can last for many months and cost the PHA substantial resources, including potentially litigation costs. The Regulatory Impact Analysis minimizes the substantial burdens on PHAs resulting from subsidy termination proceedings and instead only addresses the costs of the legal eviction process, which comes after all administrative challenges to termination are exhausted. All of these new obligations on state agency PHAs will require them to conduct additional training and hire additional staff.

124. Meanwhile, the amount of administrative fees States receive from HUD for administering Section 8 Housing Choice Voucher programs will be reduced. Because HUD pays administrative fees to voucher administrators based on the number of units that are leased in the program in each month,[138] state administrators of Housing Choice Vouchers will see a decrease in administrative fees when the voucher count decreases.

### 2. Increased Social Safety Net Spending

125. Plaintiff States' agencies provide their own housing assistance and social services to families at risk of homelessness. A number of Plaintiff States are legally required to provide emergency shelter to homeless families, either by way of entitlement programs or through state court rulings.[139]

---

[138] U.S. Dep't of Hous. & Urban Dev., *Housing Choice Voucher Program Estimated CY 2026 Administrative Fee Rates*, at 1, https://tinyurl.com/3x9sp2yw.

[139] *See, e.g.*, Cal. Welf. & Inst. Code § 11450; *McCain v. Koch*, 117 A.D.2d 198, 211 (N.Y. App. Div., 1st Dep't 1986).

126. Even Plaintiff States that do not have right-to-shelter laws have an interest in providing emergency shelter to homeless families in order to ensure their residents have safe and sanitary housing and to promote the public health and welfare.

127. As the Regulatory Impact Analysis acknowledges, the Challenged Rule will cause individuals and families to lose their homes. States and local governments will have to spend $20,000 to $50,000 per person per year to provide shelter for this population.[140] This will result in Plaintiff States spending millions of dollars to shelter families made homeless because of the Challenged Rule.

128. In areas where homelessness is already pervasive, the additional wave of families who become homeless because of the Challenged Rule will strain existing shelter capacity. In New York City, for example, shelter capacity is 12,100 units, and on average, there are only a few hundred vacant units every night, and sometimes far less. The estimated 2,540 mixed-status families who will be displaced from federally-subsidized housing as a result of the Challenged Rule[141] substantially exceeds the number of vacant units. Plaintiff New York State will have to devote additional funding to increasing shelter capacity in the City as a result of the Challenged Rule.

129. Furthermore, some Plaintiff States, including Washington, are required by state law to provide legal counsel to defendants in eviction proceedings. A sudden and sharp increase in evictions resulting from the Challenged Rule will significantly burden the state agencies and organizations that provide representation to eviction defendants. This surge in cases would strain

---

[140] Final Rule Regulatory Impact Analysis at 36.
[141] Gartland & Acosta, *supra* note 132.

already limited agency resources and potentially compromise the ability of states to provide timely and effective legal assistance to vulnerable tenants.

130. In addition, the Challenged Rule will require Plaintiff States to increase spending on other housing-related social safety net programs, including but not limited to rental supplement programs and supportive services programs, to accommodate the increase in homeless families and loss of affordable housing caused by the Challenged Rule.

131. Increased homelessness in Plaintiff States will lead to increased spending to address the adverse health effects of homelessness. It is well-established that people who are homeless face significantly worse health outcomes, including higher mortality rates, higher prevalence of communicable disease, and multiple chronic health conditions.[142] Homeless individuals often have higher rates of emergency visits and avoidable hospitalizations than individuals in stable housing.[143] The Challenged Rule will thus require Plaintiffs States to increase their spending under Medicaid programs in order to meet the medical needs of the additional population of homeless families.

**3. Reduced Income from State-financed Developments Housing Subsidized Tenants**

132. The Challenged Rule undermines States' investments in affordable housing programs by reducing rental income of state-financed owners.

[142] Nat'l Healthcare for the Homeless Council, Homelessness and Health: What's the Connection? (Sept. 2025), https://tinyurl.com/yc7zas6r.

[143] *See generally* Bon S. Ku, et al., *The Urban Homeless: Super-Users of the Emergency Department*, 17 Population Health Mgmt. 366 (2014); Travis P. Baggett, et al., *The Unmet Health Care Needs of Homeless Adults: A National Study*, 100 Am. J. Public Health 1326 (2010), https://tinyurl.com/bdf4ukc4.

133. Some Plaintiff States, including California, Colorado, Illinois, Maine, Michigan, Minnesota, New Mexico, and Oregon, finance, underwrite, or make investments to develop or maintain properties that house families receiving federal housing assistance under programs impacted by the Challenged Rule. In these affordable housing projects, States have entered into loan repayment agreements that provide that the States will receive early loan repayments to be determined by the monthly net income the property receives. The Challenged Rule will lead to subsidy termination and increased tenant turnover. Therefore, these projects will experience a decrease in monthly net income over time. As a result, States will receive reduced early loan repayments.

134. For example, California's Department of Housing and Community Development ("HCD") has provided more than $5 billion of funding over the last 30 years for the development of affordable housing. These affordable housing units, in turn, house as many as 916,395 Californians participating in HUD affordable housing programs. Under the terms of HCD's loan agreements, every year, property owners make early loan repayments to HCD representing 50 percent of the residual receipts collected by the owner after paying debt service and other permitted costs. These early loan repayments are used to fund HCD operations and are also recycled into new Notices of Funding Availability, which provide additional funding for affordable housing development. The Challenged Rule will lead to a decrease in residual receipts given reduced monthly rental income and thereby limit funding available for HCD operations.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act - 5 U.S.C. § 706(2)(A), (C)
### (In Excess of Statutory Authority, Not in Accordance with Law)

135. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

136. Defendant HUD is an "agency" under the APA,[144] and the Challenged Rule constitutes "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court."[145]

137. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or exceeds the agency's "statutory . . . authority."[146]

138. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."[147] In *Loper Bright*, the Supreme Court held that "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference."[148] Rather, it "remains the responsibility of the court to decide whether the law means what the agency says."[149]

139. An executive agency "has no power to act . . . unless and until Congress confers power upon it."[150]

---

[144] 5 U.S.C. § 551(1).
[145] *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).
[146] 5 U.S.C. § 706(2)(A), (C).
[147] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).
[148] *Id.* at 392 (emphasis in original).
[149] *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).
[150] *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

140. Defendants lack statutory authority to impose the Challenged Rule. No provision of HUD's authorizing statutes authorizes the agency to impose the Challenged Rule. Moreover, the statutes and regulations authorizing Defendants to administer specific programs also preclude the imposition of the Challenged Rule.

141. As described *supra* ¶ 65, Congress expressly defined "Financial Assistance" in the statute to provide for financial assistance to mixed-status families on a prorated basis:

> [i]f the eligibility for financial assistance of at least one member of a family has been affirmatively established . . . and the ineligibility of one or more family members has not been affirmatively established . . . , any financial assistance made available to that family by the applicable Secretary shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established . . . , as compared with the total number of individuals who are members of the family.[151]

142. Congress also expressly exempted mixed-status families from the statutory provision terminating eligibility for financial assistance of a family where they knowingly permit an ineligible person to reside in the household.[152]

143. And Congress expressly reserved discretion for PHAs to issue federal financial assistance to individuals prior to affirmatively establishing the eligibility of every individual person in the same household.[153]

144. Thus, Defendants lack authority to issue the Challenged Rule and rewrite the statutory text, for example, to disqualify U.S. citizens and eligible non-citizens who live in mixed-status households from receiving federal housing assistance.

---

[151] 42 U.S.C. § 1436a(b)(2).

[152] *Id.* § 1436a(d)(6) ("This provision shall not apply to a family if the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family.").

[153] *See id.* § 1436a(i)(2)(A).

145. Defendants' Challenged Rule also exceeds their authority and is contrary to law because it contradicts other elements of Congress's statutory scheme, including:

a. Congress's determination to not require more than a declaration to verify the immigration status of individuals who are 62 years old or older;[154]

b. Congress's determination to generally not require more than a declaration of U.S. citizen applicants;[155]

c. Congress's determination to limit use of the SAVE system, or indeed, any "automated system," to verify the eligibility for any individual who attests that they are a U.S. citizen or are older than 62 years old;[156]

d. Congress's determination to require that non-citizens have an opportunity to "appeal" an adverse verification determination to the federal immigration agency—and be protected from denial or termination of benefits during that appeal—in addition to their right to seek a hearing before the responsible entity;[157]

e. Congress's determination that public housing agency leases shall "have a term of 12 months and shall be automatically renewed for all purposes except for noncompliance" with community service requirements;[158] and

f. Congress's determination to require PHAs and not private owners to comply with DHS reporting requirements under 42 U.S.C. § 1437y, and to do so only four times a year or at the request of DHS and only when the PHA "knows" a person "is not lawfully present in the United States."

---

[154] *Id.* § 1436a(d).
[155] *Id.* § 1436a(d)(1).
[156] *Id.* § 1436a(i)(1), (2)(B)(iii).
[157] *Id.* § 1436a(d)(4).
[158] *Id.* § 1437d(l)(1).

146. For these reasons, the Challenged Rule is contrary to law and exceeds Defendants' statutory authority and must be held unlawful and set aside.

**COUNT II**
**Violation of the Administrative Procedure Act - 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious)**

147. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

148. The APA requires that a court "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious."[159]

149. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[160] An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[161]

150. Additionally, agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[162] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[163]

151. Further, when an agency changes its existing policy, it must "show that there are good reasons for the new policy."[164] An agency must provide "a more detailed justification than

---

[159] 5 U.S.C. § 706(2)(A).
[160] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).
[161] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation and quotation marks omitted).
[162] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).
[163] *Id.*
[164] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy."[165]

152. Agencies also must provide a more detailed justification "when [their] prior policy has engendered serious reliance interests that must be taken into account."[166]

153. Defendants failed to comply with these requirements in at least five respects. First, Defendants premise the Challenged Rule on misstatements of law—with respect to both Section 214 and the description of PHAs' and private owners' reporting obligations under the Challenged Rule's notice requirements.

154. Second, Defendants failed to adequately explain their decision, which lacks a rational connection between the facts found and the decision they have made. Defendants provided an inadequate explanation for their decision to newly exclude more than 55,000 U.S. citizens and eligible non-citizens from federally subsidized affordable housing. Defendants have also failed to provide the "more detailed justification" required when changing longstanding policy that has engendered serious reliance interests,[167] including their decision to impose new documentation and verification requirements on all U.S. citizens, as well as eligible non-citizens who are 62 years old and older. And Defendants failed to meaningfully review and respond to public comments opposing the Challenged Rule. For example, Defendants fail to respond entirely to public comments objecting to the Challenged Rule's removal of the definition of "other affordable housing" for determining when temporary deferral of termination would be available.

155. Third, HUD relied on factors which Congress did not intend it to consider. Defendants admitted that they promulgated the Challenged Rule to advance administration

---

[165] *Id.*
[166] *Fox*, 556 U.S. at 515.
[167] *Id.*

immigration enforcement priorities that run contrary to the very goals of the federal housing assistance statutes that the Rule purportedly implements.

156. Fourth, Defendants failed to sufficiently consider "important aspect[s] of the problem," including Congress's purposes in enacting the federal housing assistance statutes, the overarching statutory scheme, and the full scope of the burdens the Challenged Rule imposes—along with the serious reliance interests that Plaintiff States, housing providers, and families who received housing assistance have formed based on Defendants' longstanding policies.[168] Plaintiff States and their residents rely on the continued availability of federally subsidized affordable housing for mixed-status families as well as U.S. citizens and elderly non-citizens who will be impacted by the new documentation and verification requirements. Defendants failed to "weigh" these longstanding and substantial reliance interests "against competing policy concerns."[169]

157. Fifth, Defendants failed to consider other alternatives within the ambit of the Challenged Rule. As just one example, Defendants fail to explain why any changes to the documentary and verification processes were necessary to identify mixed-status families receiving federal assistance—even as it acknowledges the burdens imposed by the new requirements.

158. For each of these reasons, the Challenged Rule is arbitrary and capricious and should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court:

1. Declare that the Challenged Rule, and any and all actions taken by Defendants to implement it, are unlawful because they violate the APA.

---

[168] *See Dep't of Homeland Sec. v. Regents of the Univ. Of Cal.*, 591 U.S. 1, 25 (2020) (internal citations and quotation marks omitted).
[169] *Id*. at 30-33.

2. Issue any injunctive relief necessary to fully remediate harms to Plaintiffs, prohibiting Defendants and all persons bound by Federal Rule of Civil Procedure 65(d)(2) from implementing, applying, or taking any action whatsoever pursuant to the Challenged Rule against Plaintiff States, their local subdivisions, and their instrumentalities, including local public housing authorities;

3. Vacate the Challenged Rule, and any actions taken by Defendants to implement or enforce it;

4. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

5. Award Plaintiff States costs, expenses, and reasonable attorneys' fees; and

6. Grant such other relief as the Court deems just and proper.

Respectfully submitted, November 23, 2026

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman*
*Senior Assistant Attorney General*
William H. Downer*
*Supervising Deputy Attorneys General*
Alex E. Flores*
Nathaniel R. Hyman*
Lorraine A. López*
Heeyoung Linda Park*
*Deputy Attorneys General*

By: */s/ Delbert Tran*
Delbert Tran*
*Deputy Attorney General*
California Department of Justice
455 Golden gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Linda B. Evarts*
Linda B. Evarts*
*Special Counsel for Federal Initiatives*
Rachel Hannaford*
*Senior Enforcement Counsel Housing Protection Unit*
Arjun Mody*
*Special Counsel for Federal Initiatives*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
linda.evarts@ag.ny.gov
(646) 907-3930

*Attorneys for the State of New York*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Savannah Arguello*
Michelle Pascucci (BBO No. 690889)
*State Trial Counsel*
Hailey D'Ambrosio (BBO No. 707331)
Savannah Arguello (BBO No. 710710)
Thomas Furlong (BBO No. 717450)
*Assistant Attorneys General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
Michelle.Pascucci@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By: */s/ Syreeta A. Tyrell*
Syreeta A. Tyrell*
*Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Syreeta.Tyrell@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Kristopher Brambila*
Kristopher Brambila*
*Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Kristopher.Brambila@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Vianca Malick*
Vianca Malick*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Vianca.Malick@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Anuradha Sivaram*
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA

By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov

*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Paul Berks*
Paul Berks*
*Complex Litigation Counsel*
Gretchen Helfrich*
*Deputy Chief Special Litigation Counsel Bureau*
Office of the Illinois Attorney General
115 S. Lasalle St., 35th Floor
Chicago, IL 60603
(312) 814-3000
paul.berks@ilag.gov
gretchen.helfrich@ilag.gov

*Attorneys for the State of Illinois*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Lauren Gorodetsky*
Lauren Gorodetsky*
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.maryland.gov

*Attorneys for the State of Maryland*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Gallant Fish*
Gallant Fish*
Neil Giovanatti*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa St.
PO Box 30212
Lansing, MI 48909
(517) 241-1050
FishgG2@michigan.gov
GiovanattiN@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Joseph R. Richie*
Joseph R. Richie*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorneys for the State of Minesota*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Bryce K. Hurst*
Bryce K. Hurst*
*Deputy Attorney General*
New Jersey Office of Attorney General
25 Market St, P.O. Box 112
Trenton, NJ 08611
(609) 696-4562
Bryce.Hurst@law.njoag.gov

*Attorneys for the State of New Jersey*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Seth McMillan*
Seth McMillan *
*Deputy Solicitor General*
John Chappell *
*Assistant Solicitor General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501

*Attorneys for the State of New Mexico*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Ty Bair*
Ty Bair*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Ty.Bair@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Jacob B. Boyer*
Jacob B. Boyer*
*Governor's Office of General Counsel*
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorney for Governor Josh Shapiro*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Jordan G. Mickman*
Jordan G. Mickman*
*Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2079
jmickman@riag.ri.gov

*Attorneys for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
*Solicitor General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL OF VIRGINIA

By: */s/ Megan C. Keenan*
Megan C. Keenan *
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Jonathan Guss*
Jonathan Guss*
Zane Muller*
*Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Jonathan.Guss@atg.wa.gov
Zane.Muller@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN
By: */s/ Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Attorneys for the State of Wisconsin*